BISSELL *against* HOPKINS.

UTICA,
Aug. 1824.

Bissel
v.
Hopkins.

ON error from the Court of Common Pleas of the county of *Livingston.* The action in the Court below was trover, for a bay mare, by *Hopkins* against *Bissel*, in which the jury found a special verdict, as follows :

That, before the conversion of the mare, one *Jesse Dryer* was the owner, and had the possession of her ; and on the 1*st October*, 1819, executed and delivered to *Hopkins* a certain instrument in writing as follows : " $274,84\frac{1}{2}$. Whereas I, *Jesse Dryer*, am indebted to *Samuel M. Hopkins* in the sum of two hundred and seventy-four dollars and eighty-four and a half cents, being the balance of our accounts this day adjusted ; therefore, to provide for the payment and security thereof, I have sold and delivered to the said *Samuel M. Hopkins* the following goods and chattels, to wit : one bay mare, one cow, three yearling heifers, four grown hogs and five shoats, one stack of hay, a quantity of hay in the barn, four and a half acres of corn on the *Tallmadge* flats, three acres of corn on the upland in the *Stimson* lot, one acre of potatoes, one half the garden vegetables, one bed and bedding, one bedstead, two sets of chairs, two tables, one cupboard and three pair of fire-dogs, one five pail kettle, part of a set of blacksmith tools. And whereas part of the above articles are growing crops, and cannot now be justly estimated, therefore it is agreed, that the other above articles shall be apprai-ed by *Jerome Curtiss*, and the corn and other crops shall be estimated at fair value. according to the quantity when harvested ; and, thereupon, the condition of this conveyance is, *that upon payment being made in the above articles, or otherwise, to the above amount, the surplus and remaining articles, if any, shall be released to the said Jesse Dryer. Leicester, 1st October, 1819. Jesse Dryer.*" Upon the back of which instrument there was, on the 2*d October*, 1819, an endorse-ment made by *Jerome Curtiss*, as follows :

The possession of goods continuing in the vendor after sale, is not conclusive, but only, *prima facie*, evidence of fraud as to creditors, and may be explained.

It is a sufficient explanation that the sale was *bona fide*, and fo a valuable consideration, and that the possession of the vendor was in pursuance of some agreement not inconsistent with honesty in the transaction ; as where a tenant sells oxen to his landlord, in payment of rent, upon an agreement that the former should retain them to work his farm.

So where *D* mortgaged a mare, and various other personal chattels, to *H*, to secure an honest debt, but retained possession of the mare, with *H's* consent. in order to settle and close *D's* business as constable, he having no other horse, and also retained possession of the other articles to carry on his business ; *held*, a sufficient explanation, and that this was not fraudulent as to creditors.

A bill of sale of chattels, declaring that it is to secure a debt, and providing that, on payment of the debt by the articles or otherwise, the surplus and remaining articles shall be released to the vendor, is a mortgage ; and possession of the chattels continuing in the mortgagor, is not evidence of fraud..

" *Appraisal of the within goods and chattels.*

| | | |
|---|---|---|
| " The bay mare, | | $60 |
| cow, | | 15 |
| 3 yearling heifers, at $6, | | 18 |
| 4 grown hogs, at $4, | | 16 |
| 5 shoats, at $1, | | 5 |
| 1 stack hay, about 2 tons, | | 10 |
| 4 tons hay in the barn, $6 ton, | | 24 |
| 1 bed and bedding, | | 26 |
| 1 bedstead, (walnut) | | 2 |
| 2 sets chairs—one at 36s. and one 60s. | | 12 |
| 2 pine tables, $3, | | 6 |
| 1 pine cupboard, | | 5 |
| 2 pr. fire dogs, (cast) | | 6 |
| 1 five pail kettle, | | 5 |
| Blacksmitn's tools, viz. 1 bellows, | | |
| (old) | $15 | |
| 1 stake or beak-horn, | 2 | |
| 4 pr. tongs, | 3 | |
| 1 small sledge-hammer, and 3 hand | | |
| hammers, | 6 | |
| 1 buttress. 4s.—shoeing iron, 4s.— | | |
| clenching iron, 2s. | 1,25 | |
| 3 punches, | 50 | |
| | | 27,75 |

$237,75

2d October, 1819.                    Jerome Curtiss,"

That on the 1st January, 1821, Dryer executed to Hopkins a certain other instrument in writing, which was written on the same paper containing the first, in these words : " 1821, Jan. 1. Settled the account of the above to this time, and adjusted the balance at one hundred and forty-six $\frac{61}{100}$ dollars, for which so much of the above property as remains on hand is to remain liable. The bay mare above mentioned is to be delivered to Malcom M'Naughton, on demand, but she is intended to remain in said Dryer's use for the present, and he is to pay into Elihu Scofield's hands, for said Hopkins, in good judgments or securities, or to said M'Naughton's hands in grain,

the amount of fifty dollars, within one month, and on contin-
uing his payments in proportion, the mare is intended to re-
main with him. *Jesse Dryer*." That, in the month of *April*,
1817, a book account commenced between the plaintiff and
*Dryer* ; that settlements were made at different times be-
tween them, beside those already mentioned in writing ; and
that, at the time of the several settlements, including the
above written ones, *Dryer* was justly indebted to the plaintiff
to the amount of the several sums in the instruments in wri-
ting mentioned ; that, from the time the plaintiff's account
commenced, *Dryer* continued considerably indebted to him,
and is now justly indebted to him to the amount of more
than $100 ; that in *September*, 1817, *Dryer* rented of the
plaintiff a tavern stand and small farm, at $120 *per annum*,
and continued therein (but subsequently at reduced rents)
till the time the mare in question was sold by direction of the
defendant, as hereinafter mentioned ; that a large part of
the plaintiff's account was for rent, and that, at the time of
the sale of the mare by the defendant, more than one
year's rent was due from *Dryer* to the plaintiff. That in the
month of *November*, 1817, an account commenced between
*Dryer* and the defendant, and in *March*, 1820, a considerable
balance being due the defendant, he commenced an action a-
gainst *Dryer*, in the Court of Common Pleas of the county of
*Genesee*, and in *September* term thereafter recovered a judgment
against *Dryer*, in that Court, for $91,58, and on the 4*th* day
of *January*, 1821, the defendant caused execution to be issu-
ed on his judgment, and delivered to the Sheriff of *Genesee ;*
that the defendant directed the Sheriff to levy on the mare
in question, by virtue of his execution, if possible, while the
mare was off the premises rented by *Dryer* of the plaintiff;
that, pursuant to such directions, the Sheriff did levy and
seize upon the mare, while off the premises, but in the possess-
ion of said *Dryer*, and sold the same at publick auction or ven-
due, in the month of *February*, 1821, at which sale the defen-
dant became the purchaser, and took and led away the mare,
and that no rent was tendered or offered to be paid to the
plaintiff; that before the sale, the defendant had notice of the
plaintiff's claim to the mare, that *Dryer* had been a con-

stable, and had considerable unsettled business, and the special object of leaving the mare in his possession was, (as he had no other horse) to close such business, by which means, as he stated at the time, he hoped to make his payments ; that applications were afterwards made to *Dryer* to sell the mare, (being a well known animal, and considered valuable) to which he always, after the pledge, answered, that she was not his, and that the plaintiff had a claim on her, or owned her, and the fact of the plaintiff's claim was publickly known ; that the appraisal by *Curtiss* was meant to be a fair one, according to his best judgment ; that *Curtiss*, and also *M'Naughton*, (being the only persons who were present at, and conversant with the transaction between the plaintiff and *Dryer*) both supposed that no secrecy or concealment was intended, and never themselves had the least reserve upon the subject, or knew of any ; that, at the time the bill of sale was executed, *Dryer* was indebted to the plaintiff, and to the defendant and to others, but no judgment or execution existed against him, unless for some trivial amount, till subsequently to the assignment ; that the mare remained in *Dryer's* possession from the time when the instrument in writing first above mentioned was executed, till the seizure by the Sheriff ; that part of the articles mentioned in the appraisal herein before mentioned, had, from time to time, been delivered and credited to *Dryer* in account, but that *Dryer* made no payment after the settlement of the 1st of *January*, 1821, except the sum of $1,50, till the time of sale. And if, &c. then the jurors say, &c. and then they assess the damages of the plaintiff, &c. to $62,62, &c. And hereupon, &c.

Judgment was for the plaintiff below.

*Talcott*, (Attorney General) for the plaintiff in error, submitted the following written points or propositions to the Court.

1. The first bill of sale does not *shew on its face* that the possession of the horse should be in the vendor ; and, therefore, *it is fraudulent in law* against creditors. Whether there was fraud, *in fact*, is not material.

UTICA,
Aug. 1824.

Bissell
v.
Hopkins.

2. This bill of sale is not a mortgage. There was *no time* for the payment of the debt secured by it—no means pointed out of obtaining payment out of the property. It was an *everlasting* pledge. without delivery of the thing pledged, and, therefore, void. If a creditor can keep other creditors at bay, by such a contrivance, for *one day,* he may for ten years. Leaving the horse in the debtor's possession was, therefore, fraudulent against creditors.

3. Payment of the debt was not the *creditor's object* in taking the bill of sale. *It was* to prevent other creditors from taking the property. The memorandum at the foot of the bill of sale, dated in *January,* 1821, was an attempt, *four days* before the levy, to account for the possession of the property continuing in the *vendor,* and thus change the nature of the sale. The excuse for leaving the horse in the vendor's possession, was not sufficient. A year and half is an unreasonable time to settle his accounts as constable, &c. Both plaintiff and defendant were creditors, and the one obtaining the possession ought to have the property.

4. The defendant's knowing of the plaintiff's claim cannot affect the case ; for if the sale *was void,* as against him, his knowledge of such void claim is nothing.

5. As landlord, the defendant in error might have distrained, if any rent was due, and the property having been seized off the premises, he cannot maintain trover for it. Besides, it does not appear that the rent due was that of the last preceding year.

6. At the time of the taking and sale, the defendant in error had no right of possession.

He added, that in examining these propositions, it becomes necessary to look back to the statute of *Elizabeth.*(a) Upon the question, whether leaving property in the hands of the vendor is fraudulent as to creditors, a variety of principles are scattered through the books. Sometimes we are told the Court are to take the question into their own hands—sometimes that it is to be left to the jury—sometimes that such a possession is fraud, *per se*—sometimes that it is so, *prima facie,* only—sometimes that possession is not fraudulent where the sale is conditional—sometimes that it is so, whether the

(a) 13 *Eliz.* ch. 5, enacted almost verbatim, 1 R. L. 75.

sale be absolute or conditional. I take this to be the general principle, *that the whole depends upon the intention of the parties.* That intention in this. as in all other cases, is sometimes to be found by the jury, and sometimes it is matter of law, referrible to the Court, and to be presumed not only with, but even against evidence. Thus, Lord *Mansfield,* in *Worseley* v. *De Mattos* :(b) " Whether a transaction be fair or fraudulent, is often a question of law : it is the *judgment of law,* upon *facts and intents."* *Intent* is either *in fact* or *in law.* There are a variety of circumstances from which the law will infer an intent : in others it must be found by a jury, and is then a question of fact. An inference of law is not to be resisted ; and this proposition is well illustrated by the criminal code. One sends a child to a drawer, who takes thence a poisoned apple, eats it, and is killed. It is a question of fact for the jury, whether the child was sent on purpose. If he was, they should find the sender guilty of murder. On the other hand, if one gives a poisoned apple to *A,* with intent to murder *A* by his eating, and it should accidentally come to the hands of the child, and the donor should even interfere to prevent the child's eating it, yet the child being killed by eating the poisoned apple, the donor is guilty of murder ; for the law will infer an intention to kill the child, even against the fact. It is the same thing as to fraud. Where it depends on the actual intent, it is for the jury : if upon the constructive intent, the whole is a matter of legal inference for the Court.

We shall doubtless be told that this is the case of a *mere mortgage,* and that, therefore, *possession need not follow.* This position is not maintainable ; and the only case which looks that way is *Barrow* v. *Paxton.*(c) The acknowledged distinction between a mortgage of goods and a pledge, will be found in 1 *Powell on Mortgages,* 3, 4, and in the 2d *chapter, p.* 29, the subject is taken up, and almost the whole of that chapter is devoted to the inquiry, in what cases possession of the mortgagor and vendor is fraudulent as to creditors and purchasers ; and mortgages and absolute sales are placed by him on the same footing, in which he is abundantly sustained by the cases which he cites. He begins the chap-

UTICA,
Aug. 1824.

Bissell
v.
Hopkins.

(b) 1 Burr. 474.

(c) 5 John. Rep. 258.

ter by saying, that "A mortgage being a contract of sale exe-cuted, with power to redeem, must have all the properties and qualities incidental to the validity of an absolute dispo-sition." He then proceeds directly to apply the statute of *Elizabeth* to fraudulent mortgages of chattels ; and considers the mortgagor, who continues in full possession, as within its purview. We do not deny the doctrine, that when there is such a conditional sale, that possession in the vendor is con-sistent with it, the possession is no evidence of fraud; but a mortgage is not that case. There the property passes pre-sently, defeasible by condition subsequent ; but it is only where the condition is precedent, that the vendor's possession may be said to be consistent with the deed. The bill of sale should be such as to vest a future interest ; as where it is to become absolute on the payment of a sum of money at an-other day. What the Court say in *Barrow* v. *Paxton*, is, that " delivery always accompanies a pledge, but a mortgage of goods is *often valid* without delivery." These words, *of-ten valid*, are very cautious and qualified. They are no more than may be said of an absolute sale without change of possession, which, in common with a mortgage, may, under peculiar circumstances, *often be valid. Barrow* v. *Paxton* presented one of those circumstances. The bill of sale re-tained a right of distress. The goods continued on the de-mised premises, and the rights of creditors were not at all in question. The defendant was a purchaser, with full no-tice of the plaintiff's claim—a mere fraudulent volunteer, who had no right to protection. The remark of the Court, that a mortgage may be *often valid*, unaccompanied with de-livery, is sustained by various other acknowledged excep-tions to be found in the 2*d chapter* of *Powell*, before quoted. Why should there be any distinction between an absolute sale and a mortgage ? Why is it that continuance of possess-ion in the vendor is holden fraudulent ? Because it gives him credit. Where is the difference in fact, whether the vendor has given a mortgage or bill of sale ? How much better off is the creditor on account of the proviso in the bill of sale, than if he had been deprived of the property with-out a proviso ? The principle contended for on the other

UTICA,
Aug. 1824.

Bissel
v.
Hopkins.

side, leads to all the evils of allowing an absolute sale, without a transfer of possession. All the parties need do, in order to give it complete effect, is to attach a proviso.

In *Clayborn* v. *Hill,(d)* a mortgage of personal property, the possession continuing in the mortgagor, was declared valid, upon the sole ground that such mortgages were recognized by a statute of *Virginia*, which guarded against fraud, by providing that the mortgage should be recorded, like our mortgages of land. But, even in that case, the question did not necessarily arise ; and the conveyance was pronounced void, on the ground that the equity of redemption had been released, and the possession of the vendor continued notwithstanding. This was the only point directly before the Court. The remarks in regard to the mortgage, as such,(e) are mere *obiter dicta* of the President.

*(d)* 1 *Wash.*
*Rep.* 177.

*(e)* *id.* 184,
*S. C.*

The case of *Clow & Sharp* v. *Woods*, decided by the Supreme Court of *Pennsylvania*, at *Pittsburgh*, *Sept.* 1819, *MS.(f)* drew in question the validity of an unrecorded mortgage of goods, which continued in possession of the mortgagor. It was adjudged fraudulent as to creditors, from the mere circumstance of the continued possession ; and, per *Gibson*, J. in delivering the opinion of the Court—"The statute, 13 *Eliz.* does not, in words, declare a conveyance of goods fraudulent, where the vendor retains possession ; but, in general terms, renders void all conveyances made to the end, purpose and intent of defrauding creditors. Hence it becomes incumbent on the Courts to determine, from all circumstances of the case, whether the conveyance be or be not made with a fraudulent intention ; and, in judging of that, it is held, that any neglect in leaving the vendor in possession, is fraudulent within the statute. The general rule is, *that the possession must be transferred to the purchaser.* But, it has been said, the rule does not apply to conditional sales : *that is altogether without foundation ;* for neither this statute, nor 27 *Eliz.* which provides for the securing of purchasers, makes any difference between absolute and conditional sales. The only question is, whether the sale be fraud-

*(f)* 17 *Ves.*
*Jun. Phil. ed.*
*of* 1822, 196, *n.*
(1).

(g) 1 Atk.
165, 185.

ulent ; and, if it be, it is within the statute. *Delivery of the subject matter of the contract, is as requisite in the case of a mortgage of goods, as it is in the case of an absolute sale.*"

In *Ryall* v. *Rolle,*(g) this question was much considered, and the doctrine laid down is, in terms, the same as that in *Clow & Sharp* v. *Woods.* The questions of fraud are held to depend on the same circumstances, whether they arise under 13 *Eliz.* or the statute of bankrupts, 21 *Jac.* 1. The very question here under consideration underwent the direct examination of Lord *Hardwicke*, C., *Lee*, Ch. J. of the K. B., *Parker*, Ch. B. of the Exchequer, and *Burnet*, J. of the Common Pleas, and they all agreed, in terms, 1. That the possession continuing in the mortgagor was not consistent with the deed, and that it was fraudulent in relation to creditors, considered either under the statute of fraudulent conveyances, or of bankrupts ; and the cases before that decision,(h) to this point, are all summed up, in the course of the discussion, by the different Judges. *Burnet*, J. says,(i) " The next question to be considered will be in relation to the condition of creditors, where the debtor continues in possession of the goods mortgaged. This was fraudulent at the common law, and the 13 *Eliz. cap.* 5, *s.* 1, 2, provides against it, that *it shall be void.* There is no distinction whether the sale be absolute or conditional." Again :(j) " the only thing contended for is, whether the mortgagee shall be considered as the *true owner*, or the mortgagor ; and there is no doubt the conditional vendee is *the true owner*, or *proprietary* ; and there is no reason to make a distinction between an absolute and conditional vendee, but by confounding the difference betwixt pawns and mortgages. There might some doubt arise, if this was the case of a pawn, as in the case, 3 *Bulstr.* 17, but it cannot be doubted in the case of a mortgage, for it is an immediate sale to the mortgagee ; and though the mortgagor may buy it again, or redeem by favour of a Court of Equity, till then the vendee is the absolute proprietor. A pawn is complete by a delivery, but on a conditional or absolute sale, the sale is complete by the contract, and the party is entitled to a delivery of the goods, as soon as he has paid the price. (*Salk.* 113. *Dyer*, 20, 203.)"

(h) A. D.
1749.
(i) 1 Atk.
167, S. C.

(j) id. 170.

UTICA,
Aug. 1824.

Bissell
v.
Hopkins.

Again: "as there is no authority to warrant a distinction between absolute and conditional sales, so there is a case that destroys it. (*Stevens* v. *Sole, in Chanc. Trin.* 1736, 1 *Ves.* 352.)"

This, as I before remarked, should be understood of a sale defeasible upon condition subsequent, not precedent, as in the case put by *Burnet,* J. of a sale of goods which remain because the money is not paid ; but, he adds,(*k*) " If a conditional vendee pay the money, and does not insist upon a delivery of the goods, he confides in the credit of the vendor, and not in any real or particular security ; and ought to come in under the commission, as much as any other person that places a confidence in the bankrupt, and not in any other security." It is only, therefore, in case of a precedent condition, that the vendor may hold possession ; and this distinction was taken by *Lee,* Ch. J.(*l*) on referring to 2 *Bulstr.* 226 : and, on recurring to what *Coke,* J. says, in *Stone* v. *Grubham,*(*m*) it will be seen that he makes the same distinction, in terms.

The bill of sale in question, in *Manton* v. *Moore,*(*n*) was but a mortgage ; and yet it is evident the Court consider it resting on the same footing as an absolute bill of sale ; or why should they advert to the various particular circumstances of the case to find a warrant for the goods continuing with the mortgagor ?

*Worseley* v. *De Mattos*(*o*) arose under the statute of 1 *Jac.* 1 c. 15. It was a mortgage of goods, and it was agreed that possession was material. Ld. *Mansfield* remarks upon, and distinguishes three cases cited to shew that a change of possession was not necessary,(*p*) and says the first was against, and the other two could not be considered as deciding the proposition ; and proceeds, " If he mortgages and parts with the possession of goods, the world has notice ; but to give priority from mortgaging goods, of which the trader is allowed to act and appear as the owner, would be enabling him to impose upon mankind, and draw them in by false appearances. No injustice is done to such mortgagee ; because he really trusts only to the general credit of the trader. The conveyance is not a fraud against him, but against his other creditors." In *Wilson* v. *Day,*(*q*) which was also the case of a personal

(*k*) *id.*

(*l*) *id.* 170.

(*m*) 2 *Bulstr.* 226.

(*n*) 7 *T. R.* 63.

(*o*) 1 *Burr.* 467.

(*p*) *id.* 482, &c.

(*q*) 2 *Burr.* 827.

UTICA
Aug. 1824.

Bissell
v.
Hopkins.

(r) id. 830.
(s) id. 831.

(1) 2 T. R.
649.

mortgage, he says the same thing,(r) and *per Foster*, J.(s) a trader, before bankruptcy, may pay a particular creditor; or he may mortgage his effects to a particular creditor, *with possession delivered ;* and here it is a mortgage, it is true, with a resulting trust to *Lawson ;* but there is no alteration of possession ; no delivery, which is the badge of ownership. (*Twyne's case,* 3 *Co.* 81. *a.*)　*Wilmot,* J. concurred, in the same terms.　*Ladbroke* v. *Crickett*(1) was a question between an execution creditor who had levied upon a vessel, and a creditor by bottomry (in nature of a mortgage) on the same vessel ; and because the latter had reduced the ship into his own possession before the levy, he recovered : but, per Ld. *Kenyon,* C. J. " If no possession had been taken under this instrument, it would have been fraudulent ; and any other creditor might have taken her in execution : but here the title of the first purchaser was consummated by taking possession of the ship."

(t) *Cowp.* 232.

In *Mace* v. *Cadell,*(t)Ld. *Mansfield* takes up and considers what is the true distinction between questions arising under the 13 *Eliz.* & 21 *Jac.*　The latter, he held, subjects goods to the commission of bankruptcy, though they were not *originally* the bankrupt's, but were merely leased to him, if he used and possessed them as owner ; and he says if this latter statute " meant to comprehend nothing more than is contained in the preamble, it means nothing at all ; because even *before* the statute, if a man had *conveyed* his *own* goods to a third person, and had kept the possession, such possession would have been void, as being fraudulent, according to the doctrine in *Twyne's case,* 3 *Rep.* 81." In all other points the doctrine is the same, whether upon the statute of *Eliz.* or *James.*

Thus the Court will perceive, by adverting to the cases, that they all concur in the general rule, whether the bill of sale be absolute or conditional, that possession must follow the sale.　Cases where it may be retained are mere exceptions to the rule arising from special circumstances.　Whether the sale be absolute or conditional, a continuing possession in the vendor may be explained, but not in one case any more than in the other.　What reasons are available, then,

In case the sale is absolute? Property not capable of delivery is one; as a ship at sea. Where the vendor refuses to deliver, though the money be paid, holds the vendee at arm's length, and puts him to his action of trover, is another. It is true that it may become material to inquire into the conditions of the sale, to see whether the reasons for retaining possession be good. If the sale be absolute, necessity alone is an excuse. If left even from the most humane motives, fraud is a presumption *de juris et de jure*, which nothing can resist. By classifying the cases, it will be seen that there is no difference of principle, though there may be in the expressions used. By some cases, we are told that where one makes a bill of sale to secure a debt, and the bill is absolute on its face, and there is a continuance of possession in the vendor, it will be deemed fraudulent unless such conduct be fully accounted for. We say necessity alone will account for it, under this rule. The same rule and same explanation holds where the owner sells for cash advanced, or an antecedent debt, though otherwise of money lent to buy the goods with. Where it is necessary that the vendor should do something about the goods for the benefit of the vendee, the former may retain possession for this purpose; and circumstances may render it imperiously necessary that he should retain the goods for the purpose of selling them for the vendee's benefit. In such a case the sale was holden not to be fraudulent.(c) Another exception may perhaps be considered as established; and that is, where the goods are disposed of by a public judicial sale to one, other than the creditor, and are left with the debtor; there it may be necessary to shew *actual* fraud.(u) Accordingly, in *Guthrie* v. *Wood*,(v) Ld. *Ellenborough* said, "The doctrine of possession applies to cases of conveyance from the party himself. The statute of *Eliz.* does not apply to a case like this, where the property is sold not by the party, but under a distress for rent." Goods conveyed by a marriage settlement, by a husband to trustees, in trust for the wife, are also an exception, from the peculiar nature of the transaction and the relation of the parties.(w)

It cannot be pretended that the present case comes within any of the exceptions to the general rule. The doctrine

<div style="margin-note">

UTICA,
Aug. 1824.

Bissell
v.
Hopkins.

(c) For these distinctions see the cases cited by *Kent, Ch. J.* in *Sturtevant* v. *Ballard,* 9 *John.* 337.
(u) *Cole* v. *Davies,* 1 Ld. *Raymond,* 724, 725.
(v) 1 *Starkie,* 367, 369.

(w) *Cadogan* v. *Kennet,* *Cowp.* 432.

</div>

is universal that there must be a satisfactory explanation why the possession continues with the vendor. Here is none. The possession was not even confined to a reasonable time for the vendor to arrange his affairs as a constable. It was left for the debtor's own use, for a long and unreasonable time. No case can be found justifying this. The money was due from the moment of the sale, but no time specified for its payment. The doctrine of the other side will enable any man to defeat his creditors of their just debts, and yet enjoy his property during his whole life.

*S. M. Hopkins,* defendant, *in pro. per.* submitted to the Court the following propositions, points and references in writing :

1. It is admittted to be the general rule, that a *sale* of chattels, unaccompanied by possession, is, by presumption of law, *prima facie,* fraudulent.

2. But this rule is subject to exceptions in all cases where the vendor's possession is for a fair and lawful reason ; and where that possession accompanies and follows the deed or bill of sale. (*Cowp.* 432. 2 *Bulst.* 225. *Prec. in Ch.* 285. 1 *Ld. Ray.* 724. 2 *T. R.* 579, *per Buller, J.* 1 *Cranch.* 309. 9 *John.* 201, & 9 *John.* 337, *in which most of the above are cited.*)

3. And our decisions have fully recognized the doctrine, that sales, subject to a general presumption of legal fraud, may still be valid in special cases, to be approved by judgment of law, such as, where the *intent is fair—not calculated to work a wrong,*" &c. &c. (9 *John.* 33, *per Kent, Ch. J.* " *unless in special cases to be approved by the Court,*" 5 *John. per Spencer, J.*)

4. And on those grounds a *bona fide* mortgage of goods is universally allowed.

5. In this case, the first instrument was a plain mortgage, payable on demand. It has all the qualities of a mortgage ; 1, a debt acknowledged ; 2, a property conveyed to secure payment; 3, a clause of redemption.

6. The 2d instrument was plainly a mortgage also—or rather a continuation of the first, occasioned by a 2d adjust

ment of the accounts, made at the close of the year; and it is upon the effect of the 2d instrument that the question turns.

7. This transaction was perfectly fair, reasonable, public, and well known to the defendant below.

8. In such a case as this, it would be no objection that the property might be kept from the other creditors a long time or even forever, if that had been the intent; for the other creditors can never have any just claim upon it.

He added, the conveyance here is of definite property, which is made the subject of a definite appraisal; and the *bona fides* admitted. There is nothing to intend. Every thing necessary to sustain the transaction is found by a special verdict, upon which, it should be remembered, the question arises. That verdict finds the *bona fides*. It is enough that it does not find *mala fides;* and the only question for the Court to decide is, whether fraud arises from such a case by necessary legal intendment. The value of the property is short of the debt. The bill of sale provides that, on payment, the surplus shall be released. *Bissell* did not obtain judgment nor even prosecute for his debt till after the pledge; and the seizure and conversion upon his execution was before default of paying the debt upon the second mortgage.

Much has been said about *legal fraud* and *fraud in fact;* and I agree that the understanding to be derived from the books is not very clear, as to what these phrases mean, and the distinction between them. One sells goods which, from motives of humanity merely, the vendee still suffers to remain in the possession of the vendor : The rules of law say this is liable to the imputation of fraud. The reason, says the Attorney General, is, because it gives a false credit. On this I take issue. The reason is totally different. It is that the parties have power to hatch up a fictitious debt, give it the appearance of fairness, and make it a colorable lien on property. The law, therefore, comes with a general rule to supply the defect of human testimony, and reach the truth. It seizes upon *indicia* as a standard of proof, and

by a presumption *de jure*, pronounces the continuance of possession fraudulent. Then, I say, though *prima facie* fraudulent, this presumption may, in all cases, be repelled. It is always subject to be rebutted by proof that the sale is *not fraudulent*.

Two positions are taken on the other side, not exactly consistent. It is first said that possession continuing in the vendor is always an indication of fraud ; and then again, that, in certain cases, it may be accounted for ; and that the goods, being the subject of a mortgage, is one way of giving such an account. The moment you admit it may be accounted for, the rule is gone as to there being a presumption *de juris et de jure ;* for it depends upon, and is a question of fact. If a question of fact, may not human affairs be so modified as to present facts beyond those which have ever before entered into any case ? Is necessity alone an answer ? Shall it be said that a *bona fide* possession, and nobody injured, is not equally an excuse ? One gives property with fair appraisement, to an amount less than the debt, and passes it by mortgages. Is not this one of the answers which may be given ? Suppose it mortgaged at 7 years or 70 years : the debtor has a right to mete it out to creditors as he chooses : and why not 70 years, if no one is injured ? But "we cannot levy upon it." No matter. You gave no credit on the faith of it ; and are not injured. Then we come back to the inquiry ; wherefore does the law object ? Why does it interpose presumption ? I answered because, for aught we know, there may be fraud, and it being so liable, we will presume, and deny the truth and reality of the business, and call it a fictitious sale until explained and answered. Here it is explained. The record says it is fair ; and the plaintiff in error is driven to the length of saying that, in the face of a record, the Court must find bad faith.

Although the line of distinction which I advance, may not be well drawn, yet it has been constantly recognized by the Courts. It is not necessary to extend our inquiries beyond the 13 *Eliz.* and the cases upon that statute. Nor will I say that where third persons are injured by giv-

ing credit or purchasing on the faith of the possession, Courts will not presume fraud in order to protect them. I was going on to cite cases to establish the distinction I last advanced; but I will first examine *Edwards* v. *Harben*.(x) *Buller*, J. speaks of non-delivery as a circumstance, *per se*, which makes the sale void in point of law; and adds, " we are all of opinion, that *if there be nothing but the absolute conveyance without the possession*, in point of law it is fraudulent." It is upon such propositions as this, scattered through the books, that legal intendment is insisted on. In that case the vendor sold, but retained possession; and I admit the legal intendment of fraud followed; but what becomes of the presumption, if there be *something else* in the case besides *conveyance* and *possession?* How does this differ from cases of presumption *de jure* upon facts found by special verdict, or admitted by a demurrer? Not one case can be found in which *bona fides* was made out, where fraud was ever presumed; and the whole course of the authorities go on this ground. The late case of *Benton* v. *Thornhill*,(y) I shall not largely insist on, because I agree that it was of a mixed character upon the question of possession, which was left to the jury, to say whether fraudulent or not; but contending for delivery upon a mortgage, is in the face of *Barrow* v. *Paxton*,(z) decided by this Court, which is a leading case, and which has guided the profession in transactions of this kind ever since. In *Craig* v. *Ward*,(a) the Court say, " There must be a fraudulent or deceptive purpose in view, or implied, under the special circumstances of the case." In *Sturtevant* v. *Ballard*,(b) the Court again recognize fraud as matter of actual intent. There must, say they,(c) " be some sufficient motive, and of which the Court is to judge, for the non-delivery of the goods, or the law will still presume the sale to have been made with a view to " *delay, hinder or defraud creditors.*" Again: " In such cases, it has been frequently said not to be absolutely fraudulent; or not so in point of law, to permit the donor to continue in possession. The only inquiry would be as to matter of *fact*, whether the transaction was really and

UTICA,
Aug. 1824.

Bissell
v.
Hopkins.

(x) 2 T. R. 597.

(y) 7 Taunt. 149. 2 Marsh. 427, S. C.

(z) Supra.

(a) 9 John. 197, 201.

(b) id. 337 339.

(c) id. 339.

intrinsically fair and honest." And after a full review of the cases, the whole are summed up in these words : " We may, therefore, safely conclude, that a voluntary sale of chattels, with an agreement, either in or out of the deed, that the vendor may keep possession, is, except in special cases, and for special reasons, to be shewn to, and approved of by the Court, fraudulent and void as against creditors." In *Manton* v. *Moore*,(d) *Grose*, J. says, " I am of opinion that the question of fraud was for the consideration of the jury, and the duty of the jury, in this case, has devolved on the arbitrator, who has determined that there was no fraud." *Kidd* v. *Rawlinson*,(e) was a purchase of goods at Sheriff's sale, but not by the judgment creditor, and the goods were left with the debtor ; and Ld. *Eldon* relied upon this to take it out of the general rule ; yet he treated it as a question of fact, and left it to the jury to pronounce upon the intent. In *Worseley* v. *De Mattos*,(f) per Ld. *Mansfield*, " Nay, the not taking possession. being only *evidence of fraud*, may be explained." In *Ryall* v. *Rolle*,(g) per *Burnet*, J. " Courts of Equity and juries are to consider upon the whole evidence, whether the conveyance was made with a view to defraud or not." In *Heselinton* v. *Gill*,(h) per *Buller*, J. " It has been frequently determined, that possession alone is not evidence of fraud ; the transaction must be shewn to be fraudulent from other circumstances." In *Edwards* v. *Harben*,(i) per *Buller*, J. " On the other hand, there are cases, where the vendor has continued in possession, and the bill of sale has not been adjudged fraudulent, if the want of immediate possession be consistent with the deed." The 21 *Jac.* has a different scope and object from the 13 *Eliz.* and the cases of *Worsely* v. *De Mattos*, and *Ryall* v. *Rolle*, and other cases arising under that act, do not apply ; yet it will be seen by these cases, that fraud may be disproved even under the 21 *Jac.* This is apparent from the authorities cited by Ld. *Mansfield*, in the latter case.(j) *Powell* has been cited. He, too, proceeds throughout upon the idea that no delivery may be made, and yet the transaction not fraudulent ; and he sums up the law in this man-

(d) 7 *T. R.* 68.

(e) 2 *B. &
P.* 59.

(f) 1 *Burr.* 484.

(g) 1 *Atk.* 167-8.

(h) 3 *T. R.* 620, 621, *n.* (a)

(i) 2 *T. R.* 597.

(j) 1 *Burr.* 478, &c.

ner :(*k*) " Another ground upon which cases have been' considered as not within the purview of the statute (of *Eliz.*) is, that, by the specific words of the contract, possession was not meant to follow immediately thereupon ; for the circumstance which stains the transaction with fraud, is the false appearance held out, when one thing is done, and an appearance permitted, which imports the contrary ; an absolute, unqualified transfer of the right to the vendee, but the possession and use retained by the vendor, with no other object but to defraud. But there can be no fraud where the appearances agree with the real state of things. And what was the intrinsic nature of the contract, as to the retaining or parting with the possession, may be made out from the deeds where the transaction is in writing, and where the transaction is *en pais*, by such parol evidence as can be adduced for the purpose of proving it." Then, after illustrating this proposition by the case of *Bucknal* v. *Royston*, (*Prec. Chan.* 285,) he adopts(*l*) the words of Ld. *Mansfield*, in *Cadogan* v. *Kennet*, (*Cowp.* 432.) " Therefore the statute did not militate against any transaction *bona fide*, and where there was no imagination of fraud ; and so was the common law. The question, therefore, in every case was, whether the act done was a *bona fide* transaction, or whether it was a trick and contrivance to defeat creditors." In *Cortelyou* v. *Lansing*,(*m*) per *Kent*, J. speaking of a pledge ; " It is, therefore, to be distinguished from a mortgage of goods, for that is an absolute pledge, to become an absolute interest if not redeemed at a fixed time. Besides, delivery is essential to a pledge ; but a mortgage of goods is, in certain cases, valid without delivery." *Bucknal* v. *Royston*,(*n*) is a leading case upon these questions as to the validity of a mortgage without delivery, as between the parties, and as to creditors, under the statute of *Eliz.*— *Brewer* there mortgaged a ship in port, with the cargo and the profits of the voyage, but retained possession, and sold the cargo and invested the proceeds in other goods in the course of the voyage. A judgment creditor claimed the goods upon the return of the ship ; but the claim was overruled.

UTICA,
Aug. 1824.

Bissell
v.
Hopkins.

(*h*) *Pow. on Mort.* 43, 44, 1 *Am. from 4 Lond. ed.*

(*l*) *id.* 45.

(*m*) 2 *Caines' Cas. Err.* 202.

(*n*) *Prec. C.* 285, *case* 227.

UTICA,
Aug. 1824.

Bissell
v.
Hopkins.

Was the delivery, in that case, impossible ? Could not the adventure have been taken into the lender's own hands, and the money lent at simple interest, instead of respondentia ? Certainly, no physical or moral impossibility intervened. What, then, becomes of the doctrine of necessity ? It is admitted, that a condition precedent shall excuse, according to what *Coke*, J. says, in 2 *Bulstrode*, 226. But this is only one exception among many ; and the same effect has, again and again, been given to a condition subsequent. In *Cole* v. *Davies*,(o) it was resolved that if goods of *A* are seized upon a *fieri facias*, and sold to *B*, *bona fide*, upon valuable consideration ; though *B* permits *A* to have the goods in his possession, upon condition that *A* shall pay to *B* the money, as he shall raise it by the sale of the goods, this will not make the execution fraudulent ;" though it was agreed that actual fraud might be shewn. If a mortgage require delivery, wherein does it differ from a pledge ? Yet a distinction is constantly kept up.

(o) 1 *Ld.*
*Raym.* 724-5.

*Talcott*, in reply. It is true, that the books often say possession continuing in the vendor, is only, *prima facie*, evidence of fraud, and may be explained. This proposition I admit ; but I deny its application to the present case. It should be taken in the same sense in which it was advanced by *Buller*, J. in *Edwards* v. *Harben* ;(p) but the ulterior inquiry must be, is the explanation such as satisfies the law ? This depends on the nature of the agreement between the parties, and the circumstances attending the sale. I do not contend for a physical or moral necessity as the only explanation which can be given. There are, I admit, other cases, among which *Bucknall* v. *Royston*, is the strongest. Lord *Mansfield* says,(q) that was a case " upon the course of administration of assets, where secret liens give priority. Besides, the possession there was a trust under an authority to negotiate and sell ; and could not be meant to give any false credit." As to the distinction between a mortgage and pledge, in the latter there must be a delivery as between the pawnor and pawnee ; the former may be good as be-

(p) 2 *T. R.*
587.

(q) 1 *Burr*
482-3.

tween mortgagor and mortgagee without delivery, but not as to creditors ; and so is the passage from *Cortelyou* v. *Lansing*, as read by the gentleman ; " a mortgage of goods is, *n certain cases*, valid without delivery." Such language recognizes the doctrine that, as a general rule, delivery is necessary in the case of a mortgage. *Barrow* v. *Paxton*, I have shewn, maintains the same doctrine. " Often valid," as used in that case, is certainly not " *always*." In *Bucknal* v. *Royston*, it was *part of the trust* that the goods should remain. Why give this reason, if possession is always consistent with the mortgage ? Would it not have been enough to say, " here is a mortgage," and stop there ?

It is said the jury have found no fraud. This is a mistake. They have, in the language of the cases, found certain *facts* and *intents*, and referred the question of law arising upon these to the Court, and it is a proper question for the Court to determine. " Fraud is a question of law, and especially when there is no dispute about the facts. It is *the judgment of the law on facts and intents*, as has been frequently observed by Judges of the greatest eminence."(r) The jury find that a year and an half before the sale, a large variety of personal property, including the horse, was conveyed by a bill of sale to secure a debt, the whole continuing in possession of the debtor during all the time, from the date of the bill of sale, to the time when the horse was taken in execution at the suit of the defendant below. These circumstances, standing alone, render the sale void as to creditors, within all the English cases. It lies with the vendee to explain them ; and the Court are to say whether the explanation be sufficient, as to sales conveying a present interest. Something more than mere convenience is necessary. *Benton* v. *Thornhill*,(s) cited for the defendant in error, is against him. That was a bill of sale for securing a debt, and yet it was left to the jury to say whether the vendee's possession was honest. The jury were not called upon to say whether the vendor's possession was evidence of fraud, but whether the vendee's possession being colora-

(r) 9 *John,* 342, *per Kent* C. J.

(s) 7 *Taunt* 149.

ble, was not, in truth, the vendor's possession ; and if the latter, it was agreed that the sale must be adjudged fraudulent. The jury found possession in the vendee. The case was put upon the question of possession alone ; and the jury were correctly told, that though the debt was honest yet the sale was fraudulent unless possession passed ; this, too, in the case of a mere mortgage or bill of sale, to secure a debt. So the jury, here, have not, as supposed, found against any fraudulent intent. They find possession continued, and for what purpose, expressly ; but it is for the Court to pronounce the conclusion of law, as was held in *Benton* v. *Thornhill.* *Maggot* v. *Mills*,(t) is relied on. In answer to this, I will barely refer to 1 *Atk.* 176, where it is said, " If the sale there had been to any other person than the landlord, it would have been fraudulent." Thus that case is considered as proceeding on a very narrow doctrine, which was equally applicable to *Barrow* v. *Paxton*. Indeed, in the latter case, the language of the Court rather seems to put it upon the doctrine of landlord and tenant.

(t)   Ld.
*Raym.* 286.

*Curia,* per SAVAGE, Ch. J. The facts in this case are shortly these : In *September,* 1817, one *Jesse Dryer* rented of *Hopkins* a tavern stand and small farm, at an annual rent of $120 ; which, however, was subsequently reduced. A book account had commenced between them in *April* preceding. Settlements were made at different times. At one of them, on the 1*st October,* 1819, *Dryer* was found in arrear $274,84½ ; and to provide for the payment and security of this sum, he executed a bill of sale of a variety of articles of personal property, including the mare now in controversy. It was agreed that the articles should be appraised by *Jerome Curtiss ;* and, upon payment being made, in the articles or otherwise, the surplus and remaining articles, if any, should be released. On the next day, the articles were appraised by *Curtiss,* at $237,75, and the appraisement endorsed on the bill of sale.

On the 1*st January,* 1821, another settlement took place, at which a balance of $146,61, was found due from *Dryer,*

and another agreement was written on the same paper with the first, as follows : "1821, *January* 1. Settled the amount of the above to this time, and adjusted the balance at $146$\frac{61}{100}$, for which so much of the above property as remains on hand is to remain liable. The mare above mentioned is to be delivered to *Malcom M'Naughton*, on demand, but she is intended to remain in said *Dryer's* use for the present, and he is to pay into *Elihu Scofield's* hands, for said *Hopkins* in good judgments or securities. or to said *M'-Naughton's* hands, in grain, the amount of $50, within one month, and on continuing his payments in proportion, the mare is intended to remain with him." *Dryer* continued indebted to *Hopkins*, and at the time of the trial in the Court below, (*May*, 1821) was still indebted more than $100. A large portion of his debt was for rent. More than one year's rent was due at the time of the sale.

In the month of *November*, 1817, an account commenced between *Dryer* and *Bissell*, and in *March*, 1820, a considerable balance being due, a suit was commenced against *Dryer*, and a judgment recovered in *September*, for $91,58. Execution was issued on the 4th *January*, 1821, and delivered to the Sheriff, who was directed by *Bissell* to levy on the mare, while she was off the premises rented by *Dryer* of *Hopkins*. This was done, while the mare was in *Dryer's* possession. and in *February* she was sold at auction. *Bissell* became the purchaser. No rent was tendered or offered to be paid ; and *Bissell* had notice of *Hopkins'* claim on the mare, before the sale.

The object of leaving the mare with *Dryer*, was to enable him to settle and close his business as constable, he having no other horse. Applications were made to him for the purchase of the mare, to which he always answered, she was not his, and that *Hopkins* had a claim on her, or owned her. *Hopkins'* claim was publickly known. There was no secrecy about the transaction. When the bill of sale was executed, *Dryer* was indebted to both plaintiff and defendant, and to others, but no judgment or execution, of consequence, was obtained against him, till after the assignment. The mare remained in *Dryer's* possession from the date of

the first instrument, till seized by the Sheriff. Part of the articles had been delivered, and credited on account.

The bill of sale of the 1st October, 1819, was clearly a mortgage payable on demand, and I can see no grounds for the imputation of fraud *in fact* ; nor do I conceive the facts such as to constitute *legal* fraud. It is very distinguishable from *Twyne's case*, (3 *Rep.* 80.) The property was received at a fair valuation. The donor continued in possession; but no person was deceived or defrauded. There was no secrecy—no concealment—no suit pending till several months afterwards.

I do not think it necessary to enter upon a minute review of the cases. *Kent*, Ch. J. has examined many of them, in *Sturtevant* v. *Ballard*, (9 *John.* 338) and comes to the conclusion, that a voluntary sale of chattels, with an agreement, either in or out of the deed, that the vendor may keep possession, is, except in special cases, and for special reasons, to be shewn to and approved of by the Court, fraudulent and void as against creditors. The learned Judge, no doubt, intended to say here, as in *Barrow* v. *Paxton*, (5 *John. Rep.* 261) that possession continuing in the vendor is only, *prima facie*, evidence of fraud, and may be explained. The question in every case is, whether the act done is a *bona fide* transaction, or whether it is a trick and contrivance to defeat creditors. (*Cadogan* v. *Kennet, Cowp.* 435.) The possession, by the vendor, of personal chattels after the sale, is not conclusive evidence of fraud. The vendee may, notwithstanding, upon proof that the sale was *bona fide*, and for a valuable consideration, and that the possession of the vendor, after such sale, was in pursuance of some agreement not inconsistent with honesty in the transaction, hold under his purchase, against creditors. These points were directly resolved in *Brooks* v. *Powers*, (15 *Mass. Rep.* 244.) It appeared, in that case, that one *Witt*, in the years 1816 and 17, lived on a farm of the plaintiff, under distinct leases for each year, dated the 1st *April*. On the 14th *April*, 1817, a few days before the defendant's attachment issued, *Witt* gave the plaintiff a bill of sale of the oxen in controversy, and delivered them on the farm in payment of the rent of part of the prece-

ding year and the whole of the ensuing year. The plaintiff then agreed that *Witt* should have the oxen to carry on the farm, and they remained in his possession when the defendant caused them to be seized under his attachment. The Court held the sale valid, and expressed themselves generally as to the effect of the vendor's continuing in possession in the manner I have already stated. *Benton* v. *Thornhill*, (7 *Taunt.* 149) is a case somewhat similar.

The reason why the continuance of the vendor in possession will be accounted fraudulent is, that it gives him a false credit, by which third persons are deceived. That reason fails in this instance. When the bill of sale was executed, *Dryer* was known to be indebted to several persons, but whether he was reputed to be insolvent does not appear. His landlord had an undoubted right to secure himself for his rent. *Dryer* had a right to prefer one creditor, provided it were fairly and honesly done. In this case, the *bona fides* of the transaction is not questioned. A good reason is given, in my judgment, why the tenant was not at once stripped of his property, as thereby his power of acquiring the means to pay his debts, would have been taken from him. No deception was practised. The transaction was publick. *Dryer* himself, always, after the mortgage, stated the property of the mare to be in *Hopkins*. *Bissell* knew it before the sale, and probably before he prosecuted *Dryer*.

In my opinion, the Common Pleas decided correctly, and their judgment should be affirmed.

<div style="text-align:right">Judgment affirmed.(1)</div>

(1) Perhaps nothing farther, upon the much litigated question, how far possession by the vendor, after a sale of goods, shall be evidence of fraud as to creditors, ever can be reached by way of legal rule, than what is advanced by the Court in this case, to wit, that such possession is, *prima facie*, evidence of fraud, but may be explained. (Vid. *Dickenson* v. *Cook*, 17 *John.* 332.) It seems to be a mere rule of evidence calculated to shift the *onus probandi* from the creditor to the vendee. The details or circumstances which shall constitute fraud, like those of usury, or the degree of neglect which shall render a man liable in an action on the case, seem to mock the efforts of a general rule, and must be ranged forever without the

UTICA,
Aug. 1824.

Bissell
v.
Hopkins.

line which divides the province of the Court from that of the jury. The law may declare that fraud shall vitiate the sale; but as the devices by which that fraud is to be compassed and disguised, may be various, so the evidence by which it is to be established or repelled, must frequently vary with the cases as they arise

Some judges have started, with a high-toned rule, that unless a change of possession follows immediately, it is not only evidence of fraud, but, *per se, makes the sale fraudulent and void*. (*Edwards* v. *Harben*, 2 *T. R.* 596-7, per *Buller, J. Hamilton* v. *Russell*, 1 *Cranch*, 317, 318, per *Marshall, Ch. J. Dawes* v. *Cope*, 4 *Binn.* 265, per *Tilghman, Ch. J.*) But these learned Judges were embarrassed with numerous exceptions in the out-set; and when the late Ch. J. *Kent* made an effort, in *Sturtevant* v. *Ballard*, (9 *John. Rep.* 337) to introduce the same rule, as far as possible, into the jurisprudence of this state, he found it encumbered with the following exceptions, which he enumerates: 1. Where a creditor is knowing and assenting to the sale, (*Steel* v. *Brown*, 1 *Taunt.* 381). 2. Where the sale is conditional, (per *Coke, J. in Stone* v. *Grubham*, 2 *Bulstr.* 225; *and per Buller, J. in Edwards* v. *Harben*, 2 *T R.* 596, *i. e.* in the last case, a condition precedent to be performed by the vendee. 3. Where the goods remain with the vendor, to be sold for the benefit of the vendee, the vendor being a borrower on bottomry, (*i. e.* a mortgagor) the trust being declared by the deed, (*Bucknal* v. *Royston, Prec. in Ch* 285). 4. Where *A* purchases the goods on a *fi. fa.* in favour of *B*, and leaves them with the judgment debtor, to the intent that he pay for and redeem them, (*Cole* v. *Davies*, 1 *Ld Raym.* 724). 5. Where the goods purcha ed in this manner are left, from *benevolence*, or *for a temporary and honest purpose*, (*Kidd* v. *Rawlinson*, 2 *B. & P.* 59). 6. Where money is lent to buy furniture, and a bill of sale *honestly* taken to secure the re-payment of the money. 7. Where the purchase was a *fair* one, at publick sale, and the goods are left with a *relation* or *friend*, (per *Shippen, Ch. J. in Waters* v. *M'Lellan*, 4 *Dall.* 208). 8. Where the vendor is an intended husband, and sells to trustees to make a marriage settlement upon his future wife, (*Haselinton* v. *Gill*, 3 *T. R.* 620, *in notis*; *Cadogan* v. *Kennet, Cowp* 432). And he concludes that, except in *special* cases, and for special reasons, to be *shown* to, and approved of by the *Court*, continuance of possession is fraudulent.

To these may be added, from our own reports, 9. *Barrow* v. *Paxton*, (5 *John. Rep.* 258) where stress was laid almost exclusively on the circumstance that the bill of sale was a mortgage; (*U. States* v. *Hooe*, 3 *Cranch*, 88, 89, per *Marshall, Ch. J. S. P.*) 10 Where the non-delivery arises from the sickness of the vendor's depositary, (*Beals* v. *Guernsey*, 8 *John.* 451). To these exceptions may be added, 11. Where the assignment is of a cargo in a ship lying at the port where the assignment is executed, but bound to a foreign port, the assignment providing that remittances shall be made to liquidate the debt due to the vendee, in consideration of which debt the assignment is made, &c. (*Dawes* v. *Cope*, 4 *Binn.* 258). 12. Where the conveyance was late on *Saturday* night, and the possession remained unchanged till *Monday*, (*Will* v. *Franklin*, 1 *Binn.* 517). 13. The Supreme Court, in *M'Intire* v. *Turner*, (9 *John.* 135) seem to question the right of the creditor in

an execution, to purchase goods under his execution, and leave them with his debtor, but in England even this distinction is done away by the case of *Watkins v. Birch*, (4 Taunt. 822). " This was trespass against the Sheriff of *Middlesex*, who had taken certain goods in execution, at the suit of *Bluefield* against *Duncan*. *Duncan* had executed a warrant of attorney to confess judgment to the plaintiff, and, after judgment entered up, she issued a *fi fa*. and caused the effects of *Duncan* to be sold at publick auction, and herself became the buyer, whereupon the Sheriff, in *February*, 1811, in consideration of £58, which the plaintiff actually paid, executed a bill of sale of the goods to the plaintiff. In *May*, 1811, she agreed to let the goods to *Duncan*, who still retained the possession, for a rent ; which was regularly paid, and receipts given. When *Bluefield's* execution was about to be levied, *Duncan* clandestinely removed certain other goods which were in his possession, but none of those which the plaintiff had so bought. Upon the trial of the cause, *Pell*, Serjt for the defendant, endeavoured to establish, upon the cross-examination, a case of *actual* fraud on the part of the plaintiff, but the facts completely rebutting it, a verdict passed for the plaintiff. Upon moving for a new trial,

Per MANSFIELD, Ch. J. Unless it can be made out that the fact of a former owner of goods being in any way afterwards permitted to possess them, is a badge of fraud, I know not how this verdict can be set aside. The plaintiff buys these goods and lets them, and receives rent for them ; and can we say that a person who, under an execution, has bought goods, may not let them to the former owner of them ? No case has gone so far as that. It is a much stronger case, on account of the letting of the goods, than if she had permitted them to remain in the custody of *Duncan* without any consideration.

GIBBS, J. It is impossible to distinguish this case from the case of *Kidd v. Rawlinson*, (2 B & P. 59.) The circumstance of the plaintiff being a creditor makes no difference, if the creditor takes a regular bill of sale from the Sheriff.

<div align="right">Motion for a new trial denied."</div>

In *Reed* v. *Blades*, (5 Taunt. 216) S. P. per Gibbs, J.

14. So in *Guthrie* v. *Wood*, (1 Starkie's N. P. Rep. 367,) the plaintiff purchased the goods under a landlord's warrant of distress, and left them in possession of the tenant, the original owner, where they were seized upon an execution, at the suit of the tenant's creditor ; and, per Ld. *Ellenborough*, " I had supposed that evidence would have been given of some collusion on the part of the landlord, with the plaintiff ; but nothing of this kind appears. The doctrine of possession applies to the cases of a conveyance from the party *himself*. The statute of *Elizabeth* does not apply to a case like this, where the property is sold, not by the party, but under a distress for rent. *Guthrie* became the purchaser at the sale, as any other person might have been, and it was at his option to take the goods or leave them. He was the legal proprietor, and the creditor had no right to take them in execution." Verdict for the plaintiff.

15. A ship abroad may, of course, be sold, and possession retained by the vendor till her return. (*Putnam* v. *Dutch*, 8 *Mass. Rep.* 287.)

16. A *bona fide* sale of bricks in a brick-yard, accompanied with a lease of the yard to the vendee, until the bricks should be sold and removed, was held valid against the creditors of the vendor, without actual removal. (*Allen* v. *Smith*, 10 *Mass. Rep.* 308).

17. In *Benton* v. *Thornhill*, 7 *Taunt* 149) the following facts appeared at *Nisi Prius*. *Sparrow*, a farmer, had borrowed £600 of the plaintiff, who was his brother-in-law, and the plaintiff had sent his son to *Sparrow*, to obtain from him a bill of sale of all his effects, as security. *Sparrow* executed a bill of sale, accordingly, of *all his effects*, but not including the lease of his farm. The plaintiff's son took possession of the stock, and continued to reside in *Sparrow's* house, and employed labourers, &c. *Sparrow*, however, continued to reside in the house, and still appeared to act as master, the servants on the farm not knowing that the plaintiff's son had taken possession, as he gave them orders in *Sparrow's* name, who sold a cow and some crops, and exercised other strong acts of ownership. The goods having been afterwards taken in execution by the Sheriff, at the suit of a creditor of *Sparrow*; on a judgment for £600, (a debt due when the bill of sale was executed) an action was brought for them by the vendee, against the Sheriff. All these circumstances having been left to the jury, by Ld. Ch. J. *Gibbs*, who tried the cause, they found a verdict for the plaintiff, thereby establishing the validity of the bill of sale ; and the Court of Common Pleas refused to grant a new trial.

*Shepherd*, Solicitor General, on moving for a new trial, cited *Twyne's* case, (8 *Co.* 80, *b.*) and *Edwards* v. *Harben*, (2 *T. R.* 587) and distinguished this case from those of *Kidd* v. *Rawlinson*, (2 *B.* & *P.* 59) and *Dawson* v. *Woods*, (3 *Taunt.* 256). But he mainly relied on *Wordall* v. *Smith*, (1 *Campb.* 332) and what Ld. *Ellenborough*, Ch. J. says there. Strangers would not know that *Benton*, the son, was not residing with his uncle as a visitor. The bargainee ought to have an absolute, notorious, and exclusive possession : if the vendor remains on the premises, and continues to manage the property, the vendee having merely the instrument in his pocket, the sale is nugatory and fraudulent. But,

Per Gibbs, Ch. J. "I certainly meant, at the trial, to give the defendant the benefit of all the arguments now used in his behalf. I believe that in summing up the evidence, I did give him the benefit of all those arguments. I left it to the jury, whether this possession of *Benton's* were an honest one ; for that, if a bill of sale to *Benton* were attended with a possession, there being a debt honestly due to *Benton*, *Sparrow* had a right to make this conveyance to *Benton*, for securing his debt, and then the execution came too late, there being no bankruptcy here. I stated that the question, whether the transaction were fraudulent, depended on the object of the bill of sale, and on the circumstance, whether, under that bill of sale, an actual *bona fide* possession was delivered to young *Benton*, acting on the behalf of his father. I stated the positive oath of young *Benton*, that he was sent by his father for the bill of sale, and that he did get it, and that he remained

UTICA,
Aug. 1824.
Bissell
v.
Hopkins.

in possession under it. I also left to the jury all the circumstances which went to falsify *Benton's* evidence. *Sparrow's* acts of continuing ownership—his sowing of the corn—his declarations when the officer entered—and his remaining on the farm—which last circumstance, indeed, deserved no great weight; for his term in the land was not conveyed. And I told them, also, this, that even if there was a *bona fide* debt due from *Sparrow* to the plaintiff, yet if they thought that, beyond that debt, the conveyance was meant to colour and protect the residue of the property from *Sparrow's* other creditors, it was void for the excess. I also pointed out that the value of the property, particularly at that time, was a fluctuating one, and that, if it was the intention of the parties merely to provide for the debt to *Benton*, the verdict must be found for the defendant. The jury have come to a conclusion on these facts ; and if I were to sum up the evidence to them again, I could not sum it up otherwise than I have done."

DALLAS, J. " This is moved upon the ground that the verdict was given against the weight of evidence ; but *I think the verdict is even consistent with all the evidence.*"

PARK, J. concurred.

BURROUGH, J. " My Lord seems to have put the case to the jury on all the grounds on which it can be put, and there is no foundation for granting a new trial."

In the course of his charge to the jury, *Gibbs*, Ch. J. glanced at another circumstance, which, I suppose, must often present itself in trying a mortgage of personal property, viz. " *If beyond Benton's debt, the conveyance was meant to colour and protect the residue of the property from Sparrow's other creditors, it was void for the excess.*" Would not the mortgage be void for the whole, upon such a circumstance? In *Wilson & Wormal's* case, (*Godbolt*, 161) *Coke*, Ch. J. and *Foster*, J. were at issue upon a point like this. *Coke* said. " If a man who has goods of the value of £30, only, be indebted to two men—to one in £20, and another in £10 ; and the debtor assign to the one to whom he is indebted £10 all the goods which are worth £30, to the intent, that for the residue above the £10 debt he shall be favourable to him, this assignment is altogether void, because it is fraudulent in part." But, per *Foster*, J. " It shall not be void for the whole ; but only for the surplusage." " If the creditor were aware of the fraudulent intent of the debtor, (says *Long*, in his *Treatise on Sales*, 78) it seems most consonant to the general maxims of the common law, that fraud vitiates every thing, as well as to the provisions of the statute of *Eliz*. that the transaction should be completely avoided : if, on the other hand, the creditor were not aware of other debts being due from the debtor, but considered himself as honestly standing in the situation of trustee for the debtor, as to the excess above what would be sufficient to pay his own debt, it seems most reasonable that the assignment should be held good to the amount of the debt due, and that it should be avoided for the remainder." There is a difficulty in making this idea, that the sale shall be good in part

and bad in part, square with the remedy. It is easy to conceive, that the severance may be made in Chancery, as was done in *Boyd & Suydam v. Dunlap et. al.* (1 *John. Ch. Rep.* 478). So it might be done in trespass or trover, at the suit of the vendee, without doing absolute violence to the form of the remedy; but should replevin be brought, wh'ch is for a recovery of the specifick article or articles in question, or ejectment for land fraudulently sold or mortgaged, it is not easy to conceive how the distinction could be preserved. But this by the by.

18. The case of *Dewey* v. *Baynton*, (6 *East*, 257) presents another exception, viz. that a wife may, *after marriage*, buy her husband's personal property in exchange for her separate estate, and leave it in his possession as before; and yet this shall not be deemed fraudulent as to creditors, provided it be proved fair in all other respects. The case was shortly this: Lord *Arundell*, who had a life interest in a settled estate of Lady *Arundell*, (both being aged) of at least 3000l. a year, whereof the ultimate reversion, on failure of issue male, (of which there was none) was in Lady *A.;* and Lord *A.* having furniture and pictures in his mansion of not less than 3000l. value, being pressed by his creditors, in pursuance of an agreement with his wife, Lady *A.*, conveyed all his property to trustees, (who had married his two daughters) for the benefit of his wife and daughters, and subject to his wife's future appointment; in consideration whereof, the wife discharged him of above 3000l. before r·ised on the estate, principally for his use, and enabled the trustees to raise out of the estate 12,000l. more, for the benefit of Lord *A.'s* creditors, but subject to the appointment of him, his executors, &c.; and also covenanted to levy a fine, which was levied a year afterwards; and he covenanted to deliver an inventory of the goods to the trustees, within 6 months, which was not done. *And after the conveyance he continued to use the furniture in the house as before;* and was soon afterwards sued by several of the creditors, whose executions against his goods were satisfied by him, without setting up the trust deed, or resorting to the trust fund; but money was raised on it afterwards, for other creditors; and above two years after the deed, the husband being sued by the plaintiff, a creditor before the date of the trust deed, this was set up in bar of the levy upon the goods in the house; and the Sheriff returned *nulla bona.* And upon an action brought for a false return, *held*, that in the consideration of the question whether this were a *bona fide* transaction, or a contrivance to defeat creditors, and therefore void at common law, or by the 13 *Eliz. ch.* 5, it was material to submit to the jury the relative value of the property, withdrawn from the reach of the creditors in proportion to the amount of their demands at the time, and the value and tangibility of that substituted in its place, in aid of the conclusion that the deed was covinous against them; and, therefore, a verdict for the plaintiff, founded principally on these concomitant circumstances: 1. The previous embarrassment of the husband—2. The want of notoriety of the conveyance at the time—3. The want of an inventory—4. The continuance of the husband's possession, though consistent with the deed, yet without notice of the change of property—and, 5. The appropriation, by the husband, of a part of the money raised by the trustees, to his own use, without objec-

tion—was set aside, and a new trial granted, to bring the question more fully before the Court and jury as to the *good faith* of the transaction, and *the value of the consideration,* and its availability to the creditors.

Ld. ELLENBOROUGH, upon the first trial of this cause, at *Nisi Prius,* made a distinction between this case and that of *Cadogan* v. *Kennet,* (*Cowp.* 432) and he also questioned the case of *Kidd* v. *Rawlinson,* (2 *B.* & *P.* 59) as it appears by 10 *Ves. Jun.* 145, where the same matter came up in the Court of Chancery. The verdict being for the plaintiff, the Lord Chancellor, *Eldon,* was moved for an injunction against other executions levied upon the same property, on the ground that the verdict was contrary to law and fact, and that a new trial would be moved for in the K. B. This was the case of Lady *Arundell* v. *Phipps* & *Taunton,* (10 *Ves.* 139, 151) in which Ld. *Eldon,* (10 *Ves.* 145) was fretted to think that Ld. *Ellenborough* should have made so bad a use of the maxim that *possession proves fraud.* Indeed, his whole opinion is remarkably strong and clear, as to the force which should be allowed to that rule.

*The Lord Chancellor.* " Upon this case I believe that my decision in the Court of Common Pleas, (*Kidd* v. *Rawlinson,* 2 *B.* & *P.* 59) was disputed. My opinion upon the trial of that cause was, that possession is only, *prima facie,* evidence of fraud ; and as that property could not be reached by bankruptcy, and the possession was according to the deed which created the title, and the title was publickly created, that was not fraudulent possession against the creditors in general ; and, upon a motion for a new trial, the Court agreed with me. With great deference, if Ld. *Ellenborough* thinks otherwise, I am, at present, of the same opinion ; and I am also, at present, of opinion, upon the doctrine of this Court, that if the purchase of the wife is *bona fide,* it is of no consequence whether it was before or after marriage. The mere circumstance of possession of chattels, however familiar it may be to say that it proves fraud, amounts to no more than that it is, *prima facie,* evidence of property in the man possessing, until a title, not fraudulent, is shewn, under which that possession has followed. Every case, from *Twyne's* case, (3 *Rep.* 80) downwards, sup orts that, and there was no occasion otherwise for the statute of *King James,* (21 *Jac.* 1, *ch.* 19, *s.* 10, 11.) Can there be any doubt that a married woman, having separate property, may buy an interest in the property of her husband, by a settlement under the direction of this Court ?"

The injunction was granted upon an undertaking not to remove the goods.

A motion was afterwards made in *Dewy* v. *Baynton,* for a new trial, which was granted ; the cause tried a second time, when a verdict was again obtained for the plaintiff, upon which a motion was again made for a new trial upon the circumstances as above detailed from the report of the case in 6 *East,* 257 ; but, in the mean time, the question was again up before the Ld. *Chancellor* in *Lady Arundell* v. *Phipps,* (10 *Ves.* 146, 7, *&c.*) and his opinion shews the great variety of considerations which may enter into a question of fraud.

UTICA,
Aug. 1824.
Bissell
v.
Hopkins.

The *Lord Chancellor.* " I granted this injunction, on the ground that this bill was brought; stating that *Lady Arundell* was, according to law, to be considered equitable owner of goods and chattels of a very special and peculiar kind ; that she became so under a contract of purchase ; which she insisted she was entitled, in a mode, to make with her husband himself ; that she had contracted with him for the ownership, and instruments were executed, placing the legal property in trustees for her use and benefit ; and attending to all the circumstances, her title, as administered in this Court, and the title of her trustees, as administered in other Courts, are as incapable of being impeached, as they were upon the date of the instrument ; that an action was brought by a creditor, and the Sheriff was prevailed on to return *nulla bona.* An action was brought against him for a false return by the creditor ; insisting, he might have had possession of these goods and chattels, either the property of *Lord Arundell,* or in a question between him and his creditors and all other persons, including Lady *Arundell* and her trustees, liable to her husband's creditors. The form of the action being against the Sheriff, it depended upon some arrangement in a Court of law, whether the trustees of the wife could maintain the question, that these were not the goods of Lord *Arundell,* or liable to execution by his creditors : what arrangement I do not know : but I do not think myself at liberty to surrender the jurisdiction of this Court ; because the Court of King's Bench may by some arrangement execute the jurisdiction of a Court of Equity. It is my duty to give the plaintiff relief according to the rules and proceedings in this Court, if she is entitled to sue here ; and Lady *Arundell,* from the nature of her title, had a right to have it decided here by some mode of proceeding.

" From the only account I have had of this case [*East's* report of the case was not then published] in the Court of King's Bench, it appears to have been asserted, that a husband and wife could not, after marriage, contract for a *bona fide* and valuable consideration, for a transfer of property from the husband to the wife or trustees for her. The doctrine is not so either here or at law. I stated before what I conceived the doctrine of this Court and of the law upon this subject. There have been two trials, as there was a mistake in point of law upon the first. As to the subsequent trial, I know nothing except what is said here. But if the case is finally to be decided here, there are many points deserving great consideration, and very fit for discussion, as connected with every fact and circumstance of the case in detail ; as bearing upon the question whether this instrument is fraudulent against creditors. When Lord *Mansfie'd* upon this subject speaks of trick and contrivance (in *Cadogan* v. *Kennet,* (*Cowp.* 435) he ought to state what the law denominates trick and contrivance. For instance, in this case, if the purpose of this instrument was to defeat creditors, it is said to be bad, I desire that may be reconsidered. If the express object of this purchase was to vest this property, of the value of 12,000*l.* in trustees to transmit to the daughters of Lady *Arundell,* if she paid the value, 12,000*l.* to the creditors of Lord *Arundell,* that is not illegal. It is assuming a great deal to say it is delaying or defeating creditors. But, if so, it has in all time been sanctioned by this Court and Courts of law too. If the property transferred was of the immediate value, at which this has been stated,

certainly then it ought to be submitted to the jury whether it was not fraudulent as to a great part. It is said the limitation to the daughters here is not to be deemed a part of the consideration of the settlement with reference to the creditors. It is not necessary to touch upon that, if the property bore any reasonable proportion to the value of 12,000*l.* If it were necessary to discuss it, attention must be given to the cases of moral obligation, executed by a provision for persons, not the direct objects of the contract, in which that provision has been held such a part of the consideration as would support their interest, as well as those with regard to whom that contract was more directly entered into.

Then as to possession, and the other circumstances relied on at law : suppose the question arose the day after the deed was executed, and the 12,000*l.* had become, under the circumstances, to all intents and purposes a part of the assets of Lord *Arundell;* which I see, was questioned at the bar: suppose it proved the day after, that the property was worth that sum : could it have been contended, for the want of publicity, of an inventory, of possession, considering the nature of the subject, and the relation in which the parties stood, this would not have been a deed, the trusts of which must have been executed for Lady *Arundell.* If it is contended that the deed was originally fraudulent, because no consideration was paid or what a Court of law would call colorable, all subsequent facts and enjoyment tell forcibly, connected with the objections to the deed, at the time of execution. They are evidence in the other case ; but such as, when the value is appreciated, ought to be stated to the jury, to be weighed, regard being had to the law, if the question had occurred immediately after the execution. The circumstances of not informing witnesses, the steward, &c. would not have weighed with me ; as they are circumstances in almost every transaction of this nature ; and, therefore, not so unusual as to afford a fair ground of suspicion. Then as to the nature of the possession, what is the publicity to be ? Suppose there were no trustees ; but an agreement without the interposition of trustees, by a covenant that this property, upon the wife's advancing 12,000*l.* to the creditors of the husband should be to her separate use. The nature of the transaction must have left the legal property in the husband ; and I doubt extremely whether that could be a fraudulent possession even in a Court of law. Clearly it would not here. Suppose this had been before marriage, and these articles had been settled as heir looms ; and it is exactly the same, if after marriage and for valuable consideration ; what is the publicity shewing they are heir looms ? What is the nature of the property, and the sort of possession naturally to be looked for ? When Lady *Arundell* was making a settlement for the benefit of her daughters, afterwards in all probability to enjoy the possession of this ancient family seat, there was neither legal nor moral fraud in taking the property, for which she paid the value. But the nature of the property, the relation of the parties, the circumstances, that she should have no object but to transmit it to her family, and that she must live with him who sold it, those circumstances are very material as to the possession.

UTICA,
Aug 18 4.

Bissell
v.
Hopkins.

"It is said Lord *Arundell* dealt with creditors, as if this was his property ; and there might be a considerable question, whether his or the steward's dealings in conversation or correspondence with creditors, as if this was part of the husband's property, is to be admitted in a question between husband and wife ; more difficult perhaps between the creditors and the Sheriff; but it is extremely possible, that such a case might be laid in evidence, with reference to her acts, that the dealings of the husband might be considered a part of her conduct with regard to the property ; and therefore that sort of evidence would be admissible against her. It was also stated at the bar, that she has permitted a creditor, in more instances than one, to take execution out of this property. That is a very material fact ; but to be stated with some qualification. It is evidence that she did not believe the property to be her's ; but not conclusive evidence. She might let a part of her own property go to discharge a particular debt, by which she saw her husband pressed. That fact, therefore, ought to be examined before it can be considered as having much influence one way or the other. It is very difficult to find the means of taking the opinion of a Court of law in this particular case."

The order was, that it should be admitted that the Sheriff returned *nullæ bona ;* that an action should be brought in the Court of Common Pleas for that return ; and Lady *Arundell* and the trustees should be at liberty to defend it ; but in consequence of a fund having been provided for Lord *Arundell's* creditors, an end was put to all further proceedings, and the case never came before the Court of Common Pleas. (*Atherly on Marr. Sett'ements,* 172.)

19. The modern English decisions seem to maintain a determined conflict with the strong rule in *Edwards* v. *Harben.* That case came under review in *Steward* v. *Lombe,* (1 *Brod. & Bingh.* 506.) In that case the Sheriff had taken a windmill in execution against one *W. B.* who was in possession of it with the farm on which it stood. *W. B.* had before mortgaged the farm, describing it as one " on which he had lately erected and placed a windmill." And in the same deed sold the windmill to the mortgagee, *habendum,* &c. forever, *proviso* that if the debt 1095*l.* should be paid at such a day, the deed to be void. No change of possession of the farm or mill followed. The mill was so constructed as to be removable at pleasure ; and in an action by the mortgagee against the Sheriff, the jury were directed to answer two questions ; whether the mill was a mere chattel, and whether the property in it passed to the plaintiff, he never having taken corporal possession? The jury found that the mill was a chattel but gave a verdict for the plaintiff, damages 270*l.*

On a motion for a new trial, *Edwards* v. *Ha ben,* (2 *T. R.* 587) alone was cit'd for the defendan', and *Kidl* v. *Rawlinson,* (2 *B. & P.* 59,) and *Horn* v. *Baker,* (9 *East,* 215) for the plaintiff.

DALLAS, Ch. J. (after examining the question whether the mill was a fixture) said, "the next question is, whether, taking it to be a chattel, there has been such a possession of it as will pass the property ? Now this is not a case in which a separate and actual possession could have been ta-

ken ; for, whether the mill was legally a fixture or not, it was at all events actually fastened to the land, and it was not to be expected, that the mortgagee should come to reside in a mill. Still, it is said, that according to the case of *Edwards* v. *Harben*, actual possession is necessary to transfer the property in a chattel. Before we consider that case, it may be observed, that this question does not arise upon the bankrupt law ; it is not a case in which possession and visible ownership by a bankrupt has tended to procure him an unmerited credit; and even if it had been a case within the bankrupt laws, it would not have been a case in which the appearance could excite a false credit. This, however, is a case between mortgagor and mortgagee.

The case of *Edwards* v. *Harben* has been dissented from often. In *Kidd* v. *Rawlinson*, Lord *Eldon*, Ch. J. cites and sanctions the following passage from *Buller's Nisi Prius*, (258)" The donor continuing in possession is not, in all cases, a mark of fraud, as where a donee lends his donor money to buy goods, and at the same time, takes a bill of sale of them for securing the money." *Kidd* v. *Rawlinson* was a case of a bill of sale ; but the party taking the bill, having permitted the party giving it to remain in possession, it was held, nevertheless, that the property remained in the party who received the bill. The present case is that of a mortgage, where the mortgagee, in conformity with the usual practice in such matters, permits the mortgagor to remain in possession. In the case of *Edwards* v. *Harben*, the goods were such as pass from hand to hand, and might, therefore, without inconvenience, be transferred into actual possession ; here the chattel is of a very different description. It seems, therefore, that the constructive possession of the land under the deed is a sufficient possession of the mill standing on the land ; and the more so, as this was not an absolute conveyance, but a mere pledge to be kept till money lent on the security of it was repaid. The only possession possible, in such a case, did take place.

PARK, J. "Supposing *Edwards* v. *Harben* to be law, (though doubts have arisen as to the extent of the doctrine there laid down,) and possession to be necessary to confer the property in this mill, there has been such possession as was admitted by the nature of the case, which is very different from the case of goods capable of being transferred from hand to hand ; the possession of these by a supposed vendor, after sale, may be a badge of fraud : but would it not be ridiculous if the mortgagee should be required to come from another part of the country, and turn miller in order to take possession of his security ? This is a mortgage of land, by a party who is in the actual occupation of a mill, and if he relinquished his occupation, it would probably defeat all the ends of his mortgage. No false credit has been created by the transaction, and therefore the verdict must stand for the plaintiff."

BURROUGH & RICHARDSON, Js. were against a new trial mainly upon the ground that *quodam modo*, the mill was annexed to the land ; and *Richardson*, J. added, " That actual possession is not in all cases necessary to transfer the property of chattels, appears from *Kidd* v. *Rawlinson*, and *Wat-*

*kins* v. *Birch,* (4 *Taunt.* 823.) ,The mill could not have been moved with-out inconvenience, and the mortgagee could only take actual possession by entering on the land unnecessarily, or by occupying the mill to his own personal inconvenience; it was therefore perfectly consistent with the whole nature of the transaction, that the mortgagor should remain in possession."

New trial denied.

It is proper here to remark, that in *Steel* v. *Brown & Parry,* (1 *Taunt.* 381,) *Lawrence,* J. said, " *Edwards* v. *Harben* is good law, though not appli-cable here."

20. Exceptions to *Edwards* v. *Harben* are multiplying in this country. In *Bartlett* v. *Williams,* (1 *Pickering's Rep.* 288,) *A.* gave a bill of sale of a vessel to *B.* and *B.* promised in writing to reconvey upon the payment of a promissory note due from *A. B.* however did not take possession un-til 8 months after the delivery of the bill of sale. *Held,* nevertheless, that *B's* title was good against an attachment made by a creditor of *A.* after such possession taken, *Putnam,* J. who delivered the opinion of the Court, recognizes *Edwards* v. *Harben* as sound law; " but there," he says, " the vendee did not obtain possession under the bill of sale, *before the right of the creditors of the vendor accrued;*" and he relies for the distinction upon *Robinson* v. *Donell,* (2 *B. & A.* 134;) and particularly the remarks of *Bayley,* J. who says that, " where there was a deed executed, under which it is competent for a party to take possession immedi- tely, and he does not do so, but omits it for six months, he was not aware of any case which decides that such omission would be fraudulent, so as to make the deed void under the statute of *Elizabeth.* If, indeed, the right of a third person had intervened, the deed might be void as against him." *Put-nam,* J. continues, " The vessel was liable to the attachment until the title of the vendee was completed by possession. That was the only objec-tion which a creditor of the vendor could have made; and that objec-tion was removed before the vessel was attached. " *Quod nullo interno vitio laborat, at objecto impedimento cessat, remoto impedimento per se emer-git.*" He had before remarked, " that the possession of the vendor af-ter the bill of sale, unexplained, would render the conveyance void as against creditors; but such a possession may be explained as in *Kidd* v. *Rawlinson,* (2 *B. & P.* 59,) and be perfectly consistent with justice." The only explanation given in the case was, that the bill of sale was a mortgage to secure a sum of money. The money was payable on de-mand, and, indeed, except in the single particular, that the vendee got possession in fact before the Sheriff, the case was in all its features much like the principal one of *Bissell* v. *Hopkins.* The ship was in port at the time of the mortgage, and the possession might have been immediately. changed. That a change of possession need not accompany a mortgage, has been again and again decided in *Massachusetts.*

21. In *Bedlam* v. *Tucker,* (1 *Pickering's Rep.* 389,) the question was again before the Supreme Court of that state. The debtor mortgaged a brig to secure a subsisting debt with future advances; and the bill of sale

contained a stipulation that the brig should remain in possession of the mortgagor till default of payment ; and it was attached at the suit of the mortgagor's creditor before any change of possession or demand of possession. It is true, the brig was at sea, when the bill of sale or mortgage was executed ; but *Wilde*, J. who delivered the opinion of the Court, (*id.* 397,) drops this circumstance, and considers the naked question, whether the possession of the mortgagor pursuant to a stipulation in the deed can, in any case, be considered evidence of fraud. " But," says he, " It has been argued that the clause respecting possession was fraudulent as against creditors. No case, however, can be found in support of this objection. Similar stipulations in mortgage deeds are not uncommon, nor can they be considered unreasonable. Where, by the terms of the conveyance. the vendee is not to have possession until the performance, or non-performance of a certain condition, there the vendor's continuing in possession, is no evidence of fraud, because it is consistent with the trust appearing on the face of the deed, and is not to be presumed to give a false credit to the vendor. ' Such possession,' says *Buller*, J. (*Edwards* v. *Harben*, 2 D. & E. 596,) ' comes within the rule, as accompanying and following the deed.' (*Stone* v. *Grubham*, 2 *Bulstr.* 226. *Bucknal* v. *Roiston*, *Prec. Chan.* 285. *Jarman* v. *Wolloton*, 3 D. & E. 620. *Barrow* v. *Paxton*, 5 *John. Rep.* 258. *Kidd* v. *Rawlinson*, 2 B. & P. 60. *Cadogan* v. *Kennet*, *Cowp.* 432.) There are many cases on this point, but the principle now laid down, has never been questioned.

" An objection has also been made to the stipulation in the mortgage deed, for the security of future advances and responsibilities. Such a stipulation may have a fraudulent aspect, or may be satisfactorily explained, according to the attending circumstances. Where a mortgage is made merely to secure future advances, without any other consideration at the time, it might be void against creditors, as tending to facilitate collusion, and enabling the mortgagor to get credit on his property, without any notice that it was incumbered. But if the object of the mortgage be, as it was in the present case, to secure an existing demand, the addition of a clause protecting future advances, would not necessarily avoid the mortgage.

" As to this point, and several others already noticed, the case under consideration cannot be distinguished from that of *Atkinson* v. *Maling*, (2 D. & E. 462.) That was a case depending on a mortgage made for securing an advance, and such further sums as the mortgagee might afterwards advance ; with a clause that until default of payment should be made, it should be lawful for the mortgagor to hold the ship, and take the profits for his own use and benefit. Much stress was laid in the argument on the clause for the security of advances to be made subsequently to the mortgage ; but the Court held that there was no objection to it, and that the mortgage was valid, notwithstanding that clause, and the one respecting the possession.

" All these objections to the mortgage, therefore, are unavailing. And if the mortgagees had appeared chargeable with neglect, in not taking

possession seasonably, it would have been only evidence of fraud, and might have been explained, if submitted to the consideration of the jury. It has been always held in this state, that the possession of the vendor after sale, is only evidence of fraud, and not such a circumstance as, *per se*, necessarily invalidates the sale."

He then proceeds to consider another question, important to the creditor of a mortgagor ; and which, I believe, has not before been raised, i. e. whether the goods can be taken in execution subject to the incumbrance ? " They must," says he, " be the property of the debtor, and the attaching officer must have the right to seize them, and to hold possession, so that they may be finally taken in execution. Now there is no substantial difference, at common law, between a mortgage of real estate, and of a chattel. In both cases, the property vests in the mortgagee, subject to be defeated by the performance of the condition ; and on the forfeiture or non-performance of the condition, his interest becomes absolute. (*Powell on Mortgages*, 3, 4.) It is therefore manifest, that the attaching officer had no legal right to seize the vessel, as the property of the mortgagors ; and that his attachment of the shares mortgaged was void. The same principle applies to pawns ; for if goods be pawned, and afterwards a judgment is recovered against the pawner, the goods cannot be taken in execution, until the money is paid or tendered to the pawnee. (*The King* v. *Hanger*, 3 *Bulstr.* 17. Bro. *Abr. Pledges*, &c. 28. 2 *Bac. Abr.* 715, *Execution*, (C.) 4.)

" A mere equitable interest cannot be taken and sold on execution ; for where there is no legal right, there is no legal remedy. This was settled on great deliberation by the Court of King's Bench, in the case of *Scott* v. *Scholey et al.* (8 *East*, 467 ;) and the reasons there given, are entirely satisfactory. The judgment of the Court in that case, was sanctioned by the Court of Common Pleas, in the case of *Metcalf et al.* v. *Scholey et al.* (5 *B & P.* 461,) and is supported by all the authorities.

" It is only by statute, that equities, or rights to redeem, are subject to attachment by ordinary process, and no statute has authorized the attachment of such interest in personal property. A creditor can reach such an interest of his debtor only by resorting to a Court of Equity, where he may be let in to redeem incumbrances, (*Shirley* v. *Watts*, 3 *Atk.* 200,) unless perhaps he may first remove the incumbrance, and then lay an attachment on the property, as to which, however, we give no opinion. But until payment, or a tender of payment, of the money due to the mortgagee or pawnee of the goods and chattels, it is very clear that the creditor of the mortgagor or pawner has no remedy against them by attachment and execution.

A mortgage of goods, as to the possession continuing in the mortgagor, has been considered by several of the state legislatures, on the same footing with a mortgage of lands ; and provision by statute accordingly made for recording the mortgage in both cases. Such was the law of *Virginia*, as appears by *Clayborn* v. *Hill*, (1 *Wash. Rep.* 177.) There it is valid, if recorded, otherwise not, where the possession continues with the mort-

UTICA,
Aug. 1824.

Bissell
v.
Hopkins.

gagor. (*id.*) But in relation to absolute unconditional sales, the doctrine in *Edwards* v. *Harben*, and *Hamilton* v. *Russell*, is maintained in its highest tone, i. e. that retaining possession is, *per se, fraudulent in law*, not merely *evidence of fraud.* (*Fitzburgh* v. *Anderson*, 2 *Hen.* & *Munf. Rep.* 302, 3, *per Roane*, *J. Alexander* v. *Deneale*, 2 *Munf.* 341. *Williams* v. *Farley*, *Gilmer's Virgin. Rep.* 15.) On the other hand, where a statute provides that bills of sale shall be registered, the mere circumstance of recording will not be conclusive evidence of good faith ; but the sale may be impeached for fraud notwithstanding. Such is the law of *Maryland*, where, it seems, the statute requires even an absolute bill of sale to be recorded ; yet the vendor's continuing in possession, is evidence of fraud. (*Garrett* v. *Hughlett*, 1 *Harris* & *Johnson's Rep.* 3.) In *North Carolina*, where, it seems, the same statute regulation prevails, (*Hodges* v. *Blount*, 1 *Haywood's Rep.* 414, 415, *per Cur.*) the authority of *Edwards* v. *Harben*, is denied, and possession declared *prima facie* evidence of fraud merely ; (*id. Vick* v. *Kegs*, 2 *Haywood's Rep.* 126. *Falkner* v. *Perkins*, *id.* 224) while that case has been adopted in its greatest extent by the Judges of *Tennessee.* (*Raygan* v. *Kennedy*, 1 *Tenn. Rep.* 97.) So in *South Carolina*, (*Kennedy* v. *Ross*, 2 *Rep Constitutional Court*, *S. C.* 125.)

22. Another exception to the rule that possession is evidence of fraud, is established in this state, by *Vredenburgh* v. *White* & *Stout*, (1 *John. Cas.* 156.) There an insolvent assigned all his effects to a trustee for the benefit of his creditors ; but retained possession with the consent of the trustee, who advertised the goods for sale immediately ; but before the day of sale, they were levied upon at the suit of a judgment creditor. The sale was holden valid, the possession being consistent with the real intent of the assignment.

23. In *Butts* v. *Swartwood*, (2 *Cowen's Rep.* 431,) the vendee bespoke a bureau of the vendor, who was a cabinet maker ; he completed the article, and for fear it should be taken in execution, sent to the vendee, who came and took a delivery, but removed it from the shop of the vendor to his house to be trimmed and remain till snow came, so that it might be removed by a sleigh. A constable levied upon the article by virtue of an execution against the vendor, and the vendee recovered the value in trover, the sale being holden valid, and a possession thus explained no evidence of fraud.

24. When to these we add the exception mentioned by the Chief Justice, as having been established in *Brooks* v. *Powers*, (15 *Mass Rep.* 244,) when we look at the nature of the 24 different exceptions to the rule in *Edwards* v. *Harben*, which are above enumerated, it is time to ask, what does the rule amount to ? What is it worth ? And does its preservation merit a struggle ? Some of the exceptions are almost as broad as the rule itself. *The nature of the instrument of sale, the kind of sale, whether directly between the parties, or on execution, or distress for rent, necessity, convenience, customs of doing business, the nature, quantity, relative value, distance, and place of the articles sold, the consideration, the relation of the parties, honesty fairness, humanity, friendship, special circumstances, special reasons, &c. &c.* have, in

UTICA,
Aug. 1824.

Bissell
v.
Hopkins.

their turn, been called in by the different cases to fritter down the rule. Sometimes the attempt to apply it strikes the Judges with such evident absurdity, that they no longer proceed by way of exception. Instead of attempting to untie, they cut the knot at once by denying the existence of the rule. Such was the case in *Steward* v. *Lombe*, cited above, from 1 *Brod.* & *Bing.* 506. The counsel must have supposed it a strong rule indeed, when they asked the Court to use it for the Quixotic purpose of attacking and carrying a wind mill from one part of the kingdom to another. But the rule is worth the less, because if you allow one half the exceptions which appear to be established, it can always be evaded. If the sale is to be absolute, it may be done through a voluntary judgment and execution; if conditional, by a bill of sale in nature of a mortgage. Surely the Court act with judgment in *Brooks* v. *Powers*, when they say a voluntary and judicial sale are the same thing in effect. They do so by allowing possession to remain for an honest purpose after a voluntary sale. Had they said otherwise, they would afterwards have been baffled in a like case by the mere form of a distress for rent, or a sale upon a voluntary judgment; or a mortgage of the oxen to secure the rent due or to become due.

It is not to be denied, that in relation to voluntary, direct and absolute bills of sale, the Judges of the King's Bench have adhered to the rule of *Edwards* v. *Harben*, in all its unmitigated severity. In *Paget* v. *Perchard*, (1 *Esp. Rep.* 205,) tried before Ld. *Kenyon*, in 1794, it appeared that a publican had attempted to secure her distillers by executing to them a bill of sale of all her effects, including liquors in her house, as well as furniture, &c. on the *4th* of *April*; and a person had entered her house at 7 P. M. of that day, and taken possession, but he permitted her to sell liquour during the evening as usual, and to receive the money; and she had not accounted for it. Ld. *Kenyon* said, that allowing her to appear as usual, mistress of the house, and to execute acts of ownership, after having parted with all her property by the bill of sale, was inconsistent with such situation, and a sufficient evidence of fraud as against *bona fide* executions. And the Sheriff having levied the next day, he non-suited the distillers, the vendees, who had brought trover for the goods. Again, in *Wordall* v. *Smith*, (1 *Campl. Rep.* 332,) before Ld. *Ellenborough*, in 1808, even in an action for a false return upon a *fi. fa.* against the Sheriff for not levying an execution against one *Mason*, on certain goods, being his household furniture and stock in trade, as a publican; it appeared that before the issuing of the *fi. fa.* he had given a bill of sale of these goods to one of his creditors, who immediately put his servant into the house; but *Mason* and his wife continued to carry on the business as usual, for several weeks after; during which time, with the assent of the servant employed to keep possession, they sold beer and put the money into the till, to which they had access. And, *per Ld. Ellenborough*, " To defeat the execution by a bill of sale, there must appear to have been a *bona fide*, substantial change of possession. It is a mere mockery to put in another person to take possession jointly with the former owners of the goods. A concurrent pos-

session with the assignor is colorable. There must be an exclusive posses-
sion under the assignment, or it is fraudulent and void as against creditors."
These were *nisi prius* cases ; and it might be sufficient to remark, that
neither of them was a mere unmixt case of possession. In addition to pos-
session, strong and distinct acts of ownership were permitted, and in the
last case this continued for a considerable time. In the first, the bill of
sale was, moreover, general, probably *not even excepting the donor's appa-
rel.* These were relied on as strong marks of fraud in *Twyne's* case. Ld.
*Kenyon* puts *Paget* v. *Purchard*, upon these acts o.' ownership, in addition
to which he was doubtless influenced by the generality of the gift. And
though Ld. *Ellenborough*, in the last, lays the main stress on `possession, yet
this was not necessary ; for *Twyne's* is a point blank case to overthrow the
gift upon the acts of ownership. The learned editor of *Espinasse's Re-
ports.* (Mr. *Day*) in a note to *Paget* & *Purchard*, takes occasion to advert
to *Hamilton* v. *Russell*, (1 *Cranch*, 310,) and he says no other case goes
so far as to say that possession is *itself a fraud.* He considers *Kidd* v. *Raw-
linson*, opposed to that position. This note was published in 1808. I im-
agine it will be found that the weight of authority since that time, decided-
ly sustains *Kidd* v. *Rawlinson ;* and even goes far beyond that case, in sanc-
tioning a mere possession continued in strict and open subordination to the
rights of the vendee.

But whichever way the decisions may tend upon the question of posses-
sion in the vendor, after a voluntary, direct and absolute bill of sale ; so
far as the statute of *Elizabeth* is concerned, (*and vid. farther*, 1 *Gal'. Rep.*
422, *per Story, J. and* 1 *Halst. N. J. Rep.* 155,) no doubt can be entertain-
ed at this day, that a continued possession in a *mortgagor* of chattels is not,
*per se*, evidence of fraud, either as to purchasers or creditors. So long
ago as Lady *Lambert's case*, (*Shep. Touch.* 67,) this was settled in relation
to chattels real. A termor had mortgaged his term for years to B, upon
condition that if he repaid the money to B a year after, he should re-en-
ter, and B covenanted that the mortgagor should take the profits of the
land until that time, &c. The mortgagor did not pay, and B, hoping that
he would pay in time, suffered him to continue in possession, and take the
profits two or three years after ; and in the interim, judgment and execution
was obtained against the mortgagor. *Held*, that execution should not be
made of this lease, for the mortgage should not be said to be fraudulent as
to the creditor : and when a conveyance is not fraudulent at the time of
making it, it shall never be said to be so for any matter *ex post facto.*

That mortgages of personal chattels have been of long and extensive
practice in this state ; and considered, with reference to possession, much in
the same light with real estate or chattels real, and subject to much the
same evils, appears by an old colonial statute, passed *December* 31, 1786.
(*Van Schaick's ed. of Col. Statutes*, 524.) This act recites, that divers
frauds had been committed in *Dutchess, Richmond, Orange* and *Queens*
counties, by persons mortgaging their goods and then selling to others, ig-
norant of the mortgage ; and provides, that such mortgages, not under the

UTICA,
Aug. 1824.

value of £5, nor over £100, should be inoperative as to subsequent pur-
chasers, unless oath was first made before a magistrate that it was not giv-
en to defraud ; and the mortgage was thereupon recorded in the town
clerk's office, &c. This act expired by its own limitation, in 1771 ; and
has not been renewed. I before remarked, that permanent provisions of
a similar character have been made upon this subject, in several of the
states. The statutes of *Virginia, North & South Carolina*, and *Georgia,*
may be seen in a digest of the laws of those states, concerning con-
veyances, in a supplement to *Sheppard's Touchstone*, by Mr. *Anthon, ps.*
467, 501-2, 543-4, 467.